IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-1159

Filed 1 July 2026

Mecklenburg County, Nos. 20CR243256-590, 20CR243257-590

STATE OF NORTH CAROLINA

v.

BARRY BOYD BROADWAY

Appeal by Defendant from judgment entered 16 May 2025 by Judge Peter Knight in Mecklenburg County Superior Court. Heard in the Court of Appeals 3 June 2026.

*Attorney General Jeff Jackson, by Assistant Attorney General J. Blake Norman, for the State-Appellee.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Kathryn L. VandenBerg, for Defendant-Appellant.*

COLLINS, Judge.

Defendant Barry Boyd Broadway appeals from judgment entered upon guilty verdicts of attempted first degree murder, assault with a deadly weapon with intent to kill inflicting serious injury (AWDWIKISI), assault inflicting serious bodily injury (AISBI), and assault inflicting serious injury by strangulation. Defendant argues that the trial court erred by failing to intervene ex mero motu during the State's closing argument, failing to instruct on the lesser-included offense of assault inflicting serious injury on the AWDWIKISI charge, and sentencing Defendant for

both AWDWIKISI and AISBI for the same conduct where those convictions merge under the double jeopardy clause. The trial court did not err by failing to intervene ex mero motu during the State's closing arguments nor by not instructing the jury on assault inflicting serious injury. We arrest judgment on Defendant's conviction for assault inflicting serious bodily injury and remand for resentencing.

## I. Background

The evidence at trial tended to show the following:

Defendant and Shayla Prioleau began dating in 2019 and had been living together in Prioleau's Charlotte townhouse for approximately one month. On the evening of 29 December 2020, an argument arose when, before she went to bed, Prioleau reminded Defendant to take out the trash. Defendant became angry; he went into the bathroom and slammed the door behind him. Prioleau got out of bed, naked and unarmed, and knocked on the bathroom door to check on him. Defendant opened the door and grabbed Prioleau's neck. Prioleau attempted to fight him off, telling him that he was going to kill her. Defendant continued strangling her until she lost consciousness. Prioleau did not remember being struck or seeing a gun during the assault.

Prioleau awoke covered in blood to Defendant holding her while reciting the Lord's Prayer. She got up, put on a bathrobe, and left the townhouse. Defendant did not attempt to stop her from leaving. She drove to her mother's home where she called for help upon entering and then collapsed. Emergency services responded and

transported her to the hospital.

Medical examination revealed that Prioleau suffered a comminuted fracture of her zygoma, or cheekbone, requiring reconstructive surgery to install permanent titanium plates in her face. She had multiple lacerations on her face and head requiring staples and stitches, extensive facial swelling and bruising, and bilateral carotid artery dissections which put her at risk of stroke and brain damage. A forensic nurse examiner interviewed, examined, and photographed Prioleau at the hospital.

The following day, Prioleau's mother and brother confronted Defendant after he refused to speak to the police the night before. In a video of the interaction recorded by Prioleau's mother, Defendant admits to strangling Prioleau three times and describes waiting for her to start breathing before strangling her again.

Law enforcement arrested Defendant on 31 December 2020 and searched Prioleau's townhouse. They found blood throughout the bathroom, a rifle against the bathroom wall with blood on it, bloody clothing, and two unfired cartridges – one on the bathroom floor and one in another upstairs bedroom.

During closing argument, the prosecutor set a timer and held her breath to show the time it generally takes for "respiration to cease" during strangulation. The prosecutor also asserted that Defendant left the bathroom to retrieve his rifle and then beat Prioleau while she was unconscious. Defense counsel did not make any objections during the State's closing argument.

During the charge conference, defense counsel requested an instruction on assault inflicting serious injury as a lesser-included offense for both AWDWIKISI and AISBI. The trial court gave the lesser-included offense instruction only for AISBI.

Defendant was convicted for attempted first degree murder, AWDWIKISI, AISBI, and assault inflicting serious injury by strangulation. The trial court arrested judgment on assault inflicting serious injury by strangulation and sentenced Defendant to consecutive terms of 157 to 201 months' imprisonment for attempted first degree murder, 73 to 100 months' imprisonment for AWDWIKISI, and 16 to 29 months' imprisonment for AISBI.

Defendant timely appealed.

## II.    Discussion

### A. State's Motion to Supplement the Record

We first address the State's motion made pursuant to North Carolina Rule of Appellate Procedure 9(b)(5) seeking to alter the certified trial transcript's description of a courtroom demonstration that occurred during the State's closing argument.

A transcript designated to be used on appeal must "be settled, together with the other components of the record on appeal, according to the procedures established in Rule 11." N.C. R. App. P. 9(c)(3)(a). Pursuant to Rule 11, "[w]ithin thirty days . . . after service upon appellee of appellant's proposed record on appeal, that appellee may serve upon all other parties specific amendments or objections to the proposed record on appeal[.]" *Id.* at 11(c). "Amendments or objections to the proposed record

on appeal shall be set out in a separate document and shall specify any item(s) for which an objection is based on the contention that . . . the content of a statement or narration is factually inaccurate." *Id.*

Rule 9(b)(5) allows this Court, on the motion of a party, to supplement the record with "any items that could otherwise have been included pursuant to Rule 9" "[i]f the record on appeal as settled is insufficient to respond to the issues presented in an appellant's brief[.]" *Id.* at 9(b)(5)(a). Neither Rule 9 nor 11 allows a party to submit an affidavit contradicting the content of the certified transcript. To the contrary, Rule 11(c) requires that any objection to the contents of the proposed record – including objections asserting that "the content of a statement or narration is factually inaccurate" – must be made before the record is settled, and must be presented to the trial court, which is charged with settling the record when the parties disagree. *Id.* at 11(c).

Here, the transcript was served on both parties; the proposed record, designating the complete transcript and listing errors in closing argument as a proposed issue on appeal, was served on the State on 29 October 2025; and the record was settled by operation of law on 1 December 2025. The designated transcript describes the prosecutor's closing argument demonstration as follows:

> ([Prosecutor] setting a timer on her phone.)
>
> ([Prosecutor] holding her breath until the timer sounds.)

The State now asks this Court to replace that description with a different

factual account based on an affidavit from the prosecuting attorney, asserting that she stood silently for sixty seconds but did not hold her breath.

However, "the record imports verity and the court is bound on appeal by the record as certified." *State v. Dellinger*, 308 N.C. 288, 294 (1983). The time for objections or amendments to the transcript has passed, and the State's attempt to amend the transcript via a Rule 9(b)(5) motion is inappropriate. Accordingly, we deny the State's motion.

## B. The State's Closing Argument

Defendant argues the trial court committed reversible error by failing to intervene ex mero motu during the State's closing argument.

Defendant did not object during closing arguments. "The standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene ex mero motu." *State v. Jones*, 355 N.C. 117, 133 (2002). "This is an exceedingly high bar. It applies only when the prosecutor's statements went so far beyond the 'parameters of propriety' that the trial court is forced to intervene to 'protect the rights of the parties and the sanctity of the proceedings.'" *State v. Reber*, 386 N.C. 153, 163 (2024) (quoting *Jones*, 355 N.C. at 133). To establish a statement was grossly improper, a "defendant must show that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair." *State v. Anthony*, 354 N.C. 372, 423 (2001)

(citation omitted).

Proper closing arguments must "(1) be devoid of counsel's personal opinion; (2) avoid name-calling and/or references to matters beyond the record; (3) be premised on logical deductions, not on appeals to passion or prejudice; and (4) be constructed from fair inferences drawn only from evidence properly admitted at trial." *Jones*, 355 N.C. at 135. Counsel is nonetheless afforded "wide latitude" to argue the facts and all reasonable inferences. *State v. Covington*, 290 N.C. 313, 327-28 (1976).

### 1. *Prosecutor's Demonstration*

Defendant argues that the trial court erred by failing to intervene ex mero motu when the prosecutor demonstrated the time it takes for "respiration to cease" during strangulation by setting a timer for one minute and holding her breath until the timer sounded because it was "improper and inflammatory[.]"

Demonstrations during closing may be permissible when they are grounded in the evidence and serve to illustrate relevant issues such as premeditation and deliberation. *See State v. Jones*, 346 N.C. 704, 712-13 (1997) (five minutes of silence to illustrate time during which victim was stabbed); *State v. Hoffman*, 349 N.C. 167, 185 (1998) (two minutes of silence to illustrate time victim lay bleeding); *State v. Perez*, 135 N.C. App. 543, 553-54 (1999) (four to five minutes of silence to illustrate strangulation lasting up to ten minutes); *State v. Martinez*, 251 N.C. App. 284, 295-96 (2016) (prosecutor pointing unloaded rifle at himself to demonstrate physical positioning). Our Supreme Court has also recognized that, in the sentencing phase

of a capital trial, a prosecutor may ask jurors to appreciate the circumstances of a crime by inviting them to experience the passage of time associated with strangulation. *State v. Artis*, 325 N.C. 278, 324-25 (1989), *vacated on other grounds*, 494 U.S. 1023 (1990). Although *Artis* cautioned that such tactics may "strain[] the rational connection between evidence and inference[,]" it did not hold that timed demonstrations are per se improper in the guilt phase. *Id.* at 325 (citation omitted).

Here, during closing, the prosecutor argued: "Members of the jury, Nurse Jones told you what the absence of respiration means. And I'm gonna set a timer for you. She told you 60 seconds. About 60 seconds. 57 to 60 is what she told you for respiration to cease. Let's see how long that feels." The transcript then reflects that the prosecutor set a timer for one minute and held her breath until the timer sounded.

Nurse Jones testified that, in general, a person being strangled can lose consciousness within 5 to 10 seconds and that with "between 57 and 60 seconds" of being strangled, they "could certainly stop breathing." The prosecutor's one-minute demonstration tracked that testimony and was explicitly tied to the issue of premeditation and deliberation–how long Defendant had to form the specific intent to kill while maintaining pressure on Prioleau's neck.

Defendant argues that the prosecutor improperly asserted that Defendant used "equal and continuous pressure" for sixty seconds and that Nurse Jones' testimony was too general to support such an inference. But her testimony established that strangulation for that duration can cause cessation of respiration,

and Defendant's own recorded statement described choking Prioleau multiple times, watching her become unresponsive, and then choking her again. The prosecutor's characterization of sustained pressure and the inference that Defendant had ample time to reflect on his actions were reasonable deductions from this evidence. *See Covington*, 290 N.C. at 328.

The prosecutor's demonstration does not rise to the level of gross impropriety required for ex mero motu intervention. *Jones*, 355 N.C. at 133. The trial court observed firsthand the tone and impact of the argument that did not provoke Defendant's objection and was in the best position to determine whether, in the absence of Defendant's objection, intervention was necessary. On this record, we cannot say "that the trial court committed reversible error by failing to intervene ex mero motu." *Id.*

### 2. *Prosecutor's Statements*

Defendant argues that the prosecutor's statements that Defendant beat Prioleau after she was unconscious, "bash[ed]" Prioleau's "skull," "head," and "brains" with his fists or against objects, and went to get his rifle from another room while Prioleau was unconscious are not based on reasonable inferences from the evidence.

The evidence showed: Defendant choked Prioleau until she lost consciousness and admitted to choking her three times; Prioleau has no memory of the gun; she suffered a comminuted zygomatic fracture, multiple lacerations, and bilateral carotid dissections; a rifle with blood on it was found in the bathroom; and unfired cartridges

were found on the bathroom floor and in another upstairs bedroom.

From this evidence, the prosecutor argued that Defendant must have retrieved the rifle from another room, brought it into the bathroom, considered using it, and ultimately chose to continue the manual assault. The presence of the rifle in the bathroom with blood on it, together with cartridges in two locations and Prioleau's lack of recollection of the gun, supported an inference that the rifle was retrieved during the assault. The prosecutor did not claim to have direct evidence of Defendant's thoughts; rather, she invited the jury to infer intent from his actions and the physical evidence. *See Covington*, 290 N.C. at 327-28 (The prosecutor "may argue to the jury the facts in evidence and all reasonable inferences to be drawn therefrom together with the relevant law so as to present his side of the case.").

Furthermore, the prosecutor's use of terms like "bashing" and "over and over and over" was grounded in the testimony that Prioleau's cheekbone was shattered into multiple fragments and the pattern of injury was inconsistent with a simple fall. Prosecutors are permitted to use strong language to describe violent conduct when supported by the evidence. *See, e.g., State v. Salentine*, 237 N.C. App. 76, 85-86 (2014) (no error where prosecutor commented that the murder was "one of the most gruesome and violent murders this community has ever seen" and "one of the most brutal murders this community has seen").

We do not read the closing argument as introducing facts outside the record. The jury heard detailed medical testimony and saw photographs of the injuries and

the scene. In that context, the prosecutor's argument remained within the "wide latitude" afforded in closing. *Jones*, 355 N.C. at 128 (citation omitted).

The prosecutor's statements do not rise to the level of gross impropriety required for ex mero motu intervention. *Id.* at 133. The trial court observed firsthand the tone and impact of the argument that did not provoke Defendant's objection and was in the best position to determine whether intervention was necessary. On this record, we cannot say "that the trial court committed reversible error by failing to intervene ex mero motu." *Id.*

### 3. *Prosecutor's Description of Facts and Results from Other Appellate Cases*

Defendant argues that the prosecutor's statements describing three other cases' facts and holdings during her closing arguments were so grossly improper that the trial court reversibly erred by failing to intervene ex mero motu.

"N.C. Gen. Stat. § 7A-97 grants counsel the right to argue the law to the jury, which includes the authority to read and comment on reported cases and statutes[.]" *State v. Simmons*, 205 N.C. App. 509, 514 (2010). However, "[i]t is not permissible argument for counsel to read, or otherwise state, the facts of another case, together with the decision therein, as premises leading to the conclusion that the jury should return a verdict favorable to his client in the case on trial." *Id.* (citation omitted). "[C]ounsel may only read statements of the law in [a] case which are relevant to the issues before the jury." *Anthony*, 354 N.C. at 430 (citation omitted).

Here, the prosecutor described the facts in three published opinions together with the decisions to imply that the jury should return a favorable verdict for the State. Thus, her statements were improper. *See id.* Given the overwhelming evidence of Defendant's guilt and the brevity of the statements in the context of the prosecutor's entire closing argument, however, we do not find these challenged statements so infected the trial with unfairness that it rendered the conviction fundamentally unfair such "that the trial court committed reversible error by failing to intervene ex mero motu." *Jones*, 355 N.C. at 133.

Moreover, Defendant's argument that the trial court's cumulative error in failing to intervene ex mero motu in the State's closing argument deprived Defendant of his due process right to a fair trial free from prejudicial error lacks merit. *See State v. Huey*, 370 N.C. 174, 183-86 (2017).

**C. Lesser-Included Offense Jury Instruction**

Defendant argues that the trial court erred by not instructing the jury on assault inflicting serious injury as a lesser-included offense of AWDWIKISI because the evidence would permit the jury to rationally find Defendant's hands were not deadly weapons.

We review a trial court's decision not to instruct on a requested lesser-included offense de novo. *State v. Matsoake*, 243 N.C. App. 651, 657 (2015). "[T]he trial court must submit and instruct the jury on a lesser included offense when, and only when, there is evidence from which the jury could find that defendant committed the lesser

included offense." *State v. Boykin*, 310 N.C. 118, 121 (1984). "Where the State's evidence is positive as to each element of the offense charged and there is no contradictory evidence relating to any element," lesser-included instructions are not required. *State v. Millsaps*, 356 N.C. 556, 562 (2002). "When determining whether there is sufficient evidence for submission of a lesser included offense to the jury, we view the evidence in the light most favorable to the defendant." *State v. Ryder*, 196 N.C. App. 56, 64 (2009).

Assault inflicting serious injury is a lesser-included offense of AWDWIKISI. *State v. Lowe*, 150 N.C. App. 682, 685 (2002). The elements of AWDWIKISI are: (1) an assault, (2) with a deadly weapon, (3) with intent to kill, (4) inflicting serious injury. N.C. Gen. Stat. § 14-32(a). Assault inflicting serious injury requires: (1) an assault, (2) inflicting serious injury. *Id.* § 14-33(c)(1). A trial court must instruct on assault inflicting serious injury as a lesser-included offense of AWDWIKISI if the evidence of the defendant's use of a deadly weapon is contradicted. *See State v. Bell*, 87 N.C. App. 626, 635 (1987). "[A] 'deadly weapon' as that term is used in North Carolina jurisprudence is one that is likely to produce death or great bodily harm under the circumstances of its use[.]" *State v. Steen*, 376 N.C. 469, 481 (2020) (citation and quotation marks omitted). Hands may be considered a deadly weapon depending on the manner in which they are used and the injuries inflicted. *Id.* at 481-82.

Here, Defendant's manual strangulation caused bilateral carotid dissections—injuries that, by expert testimony, placed the victim at substantial risk of stroke and

brain damage—and his blows shattered her cheekbone into floating fragments requiring reconstructive surgery. There was no evidence suggesting a benign or non-deadly explanation for these injuries. Under *Millsaps*, the State's evidence was positive and uncontradicted as to the deadly-weapon element.

Although the treating physicians testified that, in hindsight, the injuries were not "life-threatening" and there was no intracranial bleeding or coma, that testimony does not negate the deadly character of the force used. "A deadly weapon is not one which must kill but one which under the circumstances of its use is likely to cause death or great bodily harm." *State v. Strickland*, 290 N.C. 169, 178 (1976).

Defendant argues that, because the trial court instructed the jury that it must decide whether his hands were a deadly weapon, the court implicitly recognized that the issue was for the jury and therefore should have provided a lesser option. But the question before us is not whether the trial court could have instructed on assault inflicting serious injury; it is whether it was required to do so. Where the State's evidence is positive and uncontradicted on the greater offense, the court's decision to submit the deadly-weapon question to the jury does not create a right to a lesser-included instruction that the evidence does not support. *Millsaps*, 356 N.C. at 562.

Viewing the evidence in the light most favorable to Defendant, there is no rational basis on which a jury could find that he committed an assault inflicting serious injury but did not use a deadly weapon. The trial court therefore did not err

in declining to instruct on assault inflicting serious injury as a lesser-included offense of AWDWIKISI.

**D. Double Jeopardy**

Defendant argues the double jeopardy clause prohibits him from being punished for both AWDWIKISI and AISBI for the same conduct.

The right to be free from double jeopardy is rooted in article 1, section 19 of the North Carolina Constitution and in our common law. *State v. Baldwin*, 240 N.C. App. 413, 417 (2015). "The double jeopardy clause prohibits . . . multiple convictions for the same offense." *Id.* "Where multiple punishment is involved, the [d]ouble [j]eopardy [c]lause acts as a restraint on the prosecutor and the courts, not the legislature." *State v. Gardner*, 315 N.C. 444, 452 (1986). "The [d]ouble [j]eopardy [c]lauses of both the United States and North Carolina Constitutions prohibit a court from imposing more punishment than that intended by the legislature." *Id.*

AISBI merges with AWDWIKISI under the double jeopardy clause because the AISBI statute indicates clear legislative intent that a defendant may not be convicted of AISBI if "the conduct is covered under some other provision of law providing greater punishment[.]" N.C. Gen. Stat. § 14-32.4(b) (2025); *Baldwin*, 240 N.C. App. at 426. Thus, a defendant may not be convicted of both AWDWIKISI and AISBI for the same conduct. *Baldwin*, 240 N.C. at 426-27.

However, even when two offenses might otherwise merge under the double jeopardy clause, a defendant may be convicted of both when a distinct interruption in

the assault occurs. *State v. Robinson*, 381 N.C. 207, 218 (2022). A distinct interruption may be "an intervening event, a lapse of time in which a reasonable person may calm down, an interruption in the momentum of the attack, a change in location, or some other clear break delineating the end of one assault and the beginning of another." *Id.* (citation omitted). "[T]he fact that a victim has multiple, distinct injuries alone is not sufficient evidence of a distinct interruption such that a defendant can be charged with multiple counts of assault." *Id.* (citation omitted). "The magnitude of the harm done to the victim can be taken into account during sentencing but does not automatically permit the State to stack charges against a defendant without evidence of a distinct interruption." *Id.* (citation omitted). "Further, a defendant's different methods of attack standing alone are insufficient evidence of a distinct interruption." *Id.* (quotation marks and citation omitted).

The State argues that Defendant was not convicted of both AWDWIKISI and AISBI for the same conduct because there was a distinct interruption in the assault between the blunt force trauma to Prioleau's head and the strangulations. Prioleau's separate injuries from blunt force trauma and strangulation alone are not sufficient evidence of a distinct interruption, and there is no evidence as to the timeline of events after Prioleau lost consciousness. Further, neither the indictment nor the jury instructions distinguish between the blunt force trauma and the strangulations when describing conduct relevant to the AISBI and AWDWIKISI charges. Thus, there is not sufficient evidence to determine that a distinct interruption occurred in this case,

and Defendant cannot be punished for both AISBI and AWDWIKISI for the same conduct.

## III.    Conclusion

For the foregoing reasons, the trial court did not err by failing to intervene ex mero motu during the State's closing arguments nor by choosing not to instruct the jury on assault inflicting serious injury.  We arrest judgment on Defendant's AISBI conviction and remand for resentencing.

NO ERROR IN PART; ARRESTED IN PART AND REMANDED.

Judges STROUD and ARROWOOD concur.